## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA

DAVID MELCHER, on behalf of
himself and all others similarly situated,

                              Plaintiff,

    v.

CENTRAL STATES ENTERPRISES,
LLC and LARRY SHEPHERD,

                          Defendants.

Case No. 1:21-cv-00409

**JURY TRIAL DEMANDED**

### CLASS ACTION COMPLAINT

Plaintiff David Melcher, by counsel, on behalf of himself and all others similarly situated, for his Class Action Complaint against Defendants Central States Enterprises, LLC ("Central States") and Larry Shepherd (collectively "Defendants"), alleges as follows:

### NATURE OF THE CASE

1.    This case seeks to remedy a scheme by which Defendants created and enforced fictitious, sham contracts (the "Unauthorized Contracts") with the Plaintiff and Class members requiring them to deliver quantities of grain far beyond the Plaintiff's and Class members' annual growing capacities. Defendants created the Unauthorized Contracts to cover extensive grain delivery commitments and financial losses stemming from Defendant Larry Shepherd's speculative trading on the commodities futures market. The Unauthorized Contracts either (i) were never authorized or executed by the Plaintiff and Class members or (ii) were entered into based on Defendants' fraudulent misrepresentations as to the Plaintiff and Class Members' obligations. The Unauthorized Contracts were maintained outside the Defendants' regular books and records, and

at least in part physically destroyed in an attempt to conceal Defendants' unlawful conduct that is the subject of this action.

2.      Defendants' enforcement of the Unauthorized Contracts has harmed Plaintiff and Class members by requiring them to deliver grain in quantities that far exceed their production capacity and causing them significant financial losses, including requiring substantial payments to Defendants to buy out the Unauthorized Contracts and/or preventing Plaintiff and Class members from selling their grain at market pricing substantially higher than the prices stated in the Unauthorized Contracts.

3.      Central States is a grain elevator engaged in the business of buying grain from farmers (also, "producers") and then selling it to third party buyers, commonly "hedging" these annual grain purchases through futures trading on the Chicago Board of Trade ("CBOT") to offset risks associated with fluctuating grain prices.

4.      Beginning in late 2019, Defendant Shepherd, Central States' principal grain buyer, began engaging in speculative commodities futures trades on the CBOT. Contrary to the "bona fide" hedging that is exempted from federal regulation under the Commodities Exchange Act, Mr. Shepherd's speculative trading was entirely divorced from actual grain that Central States had committed to purchase, sell or store.

5.      Not only was it speculative, Mr. Shepherd's trading resulted in massive losses for Central States in 2019 and 2020. By the mid-late 2020, with the grain harvest on the horizon, Central States faced an obligation to cover Mr. Shepherds' considerable futures losses with either nonexistent grain or cash payments.

6.      Defendants came up with a solution: put the burden on Plaintiff and farmers. Together, they sought to reconcile the trading losses by creating the Unauthorized Contracts for

grain delivery and imposing the sham contracts on the Plaintiff and Class members. Because Central States' obligation to deliver non-existent grain was vast, the Unauthorized Contracts purported to require Plaintiff and Class members to deliver grain in amounts that represent multiple years of their production.

7.     Indeed, Central States continues to demand such grain deliveries from the Plaintiff and Class members or expensive payments from them to "buy out" the terms of the Unauthorized Contracts, knowing that the Unauthorized Contracts are fictitious and were not properly entered into by the Plaintiff and Class members.

8.     Because the Unauthorized Contracts are intended to offset Mr. Shepherd's failed pricing speculation on the CBOT, and are entirely divorced from Plaintiff's and Class members' grain production capacities, they are futures contracts regulated by the Commodities Exchange Act ("CEA"). Furthermore, they were negotiated outside the comprehensive CEA statutory and regulatory scheme and purportedly bought and sold outside of an official commodities exchange, so they are illegal off-exchange futures contracts under the CEA.

9.     Most significantly, because the Unauthorized Contracts are futures contracts under the CEA, the conduct of Central States and Mr. Shepherd relating to the Unauthorized Contracts is subject to this private action. Defendants violated the CEA in several respects that give rise to claims by the Plaintiff and Class members for damages.

10.     Defendants are liable under the CEA for: (i) committing fraud by misrepresentation or omission of material facts in connection with the Unauthorized Contracts; (ii) creating and enforcing the Unauthorized Contracts, which constitute fictitious sales of grain; and (iii) engaging in fraud by employing a device, scheme or artifice in the course of a transaction while acting as a Commodities Trade Advisor.

11.     Central States and Mr. Shepherd are also liable under Plaintiff's and Class members' statutory claim for rescission, for damages based on Defendants' fraudulent inducement, and for restitution to remedy Defendants' unjust enrichment.

12.     Because of Defendants' egregious and unlawful conduct in fabricating and enforcing the Unauthorized Contracts, Plaintiff and Class members have suffered significant and ongoing harm.

## JURISDICTION AND VENUE

13.     This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the claims herein arise under laws of the United States, Section 22 of the Commodities Exchange Act (7 U.S.C. § 25, *et seq.*). This Court has supplemental jurisdiction over the state law claims because those claims arise out of the same nucleus of operative fact as the federal claims.

14.     Venue is proper in this District pursuant to 15 U.S.C. § 1391(b), (c), (d), because during the Class Period Defendants resided, transacted business, were found or had agents in this District; and a substantial part of the events or omissions giving rise to the claims occurred in this District.

## THE PARTIES

**A.    Plaintiff**

15.     Plaintiff David Melcher is an individual residing in New Haven, Indiana. Mr. Melcher does business in New Haven, Indiana. He grows soybeans, corn and wheat on 8,500 acres of land. Plaintiff Melcher has been selling grain to Central States since 1990.

**B.    Defendants**

16.    Defendant Central States Enterprises, LLC is a privately held grain elevator with operations in Florida and Indiana at all relevant times, and with its principal place of business located at 1275 Lake Heathrow Lane, Heathrow, Florida 32746.

17.    At all relevant times, Central States operated grain elevator facilities in Heathrow, Florida and New Haven and Montpelier, Indiana. Central States continues to engage in business in Indiana, including its attempts to enforce the Unauthorized Contracts.

18.    Defendant Larry Shepherd is an individual residing in Allen County, Indiana. Until late October 2020, Mr. Shepherd was the Vice President of Operations for the Indiana Division of Central States and an authorized agent for Central States.

**FACTUAL ALLEGATIONS**

**I.    GRAIN PRODUCTION AND MARKETING**

19.    Farmers in the Midwest typically plant their corn and soybean crop in late April and May and harvest the crop in the fall (September, October and November). Wheat is typically planted in October and harvested in July of the following year. Harvested grain may be stored on the farm for later delivery, or delivered immediately to a grain elevator.

20.    Grain elevators, including Central States, are in the business of grain merchandising, which is simply the purchase, storage and sale of grain. Grain elevators purchase grain from farmers when they want to sell their grain, then store the grain until end users want to purchase it. Grain elevators employ a variety of contracts for both the purchase and sale of grain.

21.    Farmers, elevators and other participants in the grain merchandising chain of commerce face risks associated with price volatility. Farmers and grain elevators attempt to manage these risks while seeking to increase profits both through grain contracting arrangements

5

for the purchase and sale of grain and by hedging their risk through buying and selling futures contracts on the CBOT. Grain contracting and hedging are by design interrelated, with futures hedge positions mirroring actual grain purchase and sale commitments.

### A. Common Grain Contracts

22.     Elevators and farmers employ several common types of contracts for the purchase and sale of grain, under which price, volume and delivery date may be fixed at the time of contracting or may remain variable and subject to later market developments. A farmer may use different types of contracts to sell various portions of anticipated or stored production.

23.     Under all types of grain contracts the most significant components of pricing are the local cash market price, the futures price and the basis:

   a. **Spot price.** The local cash price, or "spot price," is the price on a given date set by the local elevator that is purchasing the grain.

   b. **Futures price.** The futures price is the price established on a given date by the applicable board of trade, usually the CBOT.

   c. **Basis.** The basis is the difference, on a given date, between the local cash price and the futures price. The basis is set by the grain elevator to establish the local cash price; it reflects transportation and storage costs and other local market conditions.

24.     The different types of common grain contracts reflect an effort to either lock in or anticipate changes in the futures price and basis:

   a. **Spot Sale.** The simplest contract is a spot sale. The farmer sells a certain quantity of grain to the elevator for the current cash price and payment and delivery usually occur simultaneously. The cash price equals the current futures price minus the basis as set by the elevator at the time of purchase.

   b. **Forward Cash Contract.** Under a forward cash contract, the price is set at the current cash price at the date of the contract but delivery of the grain does not take place until a later time. The contract sets out the delivery date, the volume to be delivered, and the price to be paid.

   c. **Hedge-to-Arrive Contract.** A hedge to arrive ("HTA") contract is an agreement between a farmer and an elevator for the sale of a fixed quantity of grain for delivery at an agreed time in the future. Typically, the contract price is tied to a futures price

set at the time of contracting, but the basis floats until the seller decides to fix it by selecting the date of pricing.

    d.   **Basis contract.** A basis contract allows the farmer to lock in the basis price at the time of contracting, essentially taking the risk that the set basis will be more favorable than the actual basis at a later date. The farmer has up to the contract expiration date to choose a delivery date, at which time the "buy" basis will be deducted from the futures price of the grain to determine the cash price.

## B. Accumulator Contracts

25.    Accumulator contracts are a more risky variation on grain agreements. Accumulator contracts between grain elevators and farmers correspond to a hedged position taken by the grain elevator on the commodities exchange through a brokerage. Typically, the hedge position is offered by the broker to the elevator in increments of several thousand bushels (*e.g.*, 5,000 bushels of corn), and the elevator then enters into Accumulator contracts with farmers to supply the actual grain the elevator has promised to deliver.

26.    An Accumulator contract is similar to an ordinary HTA in that the grain price is tied to a futures contract price and the basis is determined when a date of delivery is selected. However, Accumulator contracts also contain an "accumulation period."[1] The "accumulation period" is a timeframe between two specified dates, where the weekly quantity of bushels can "double-up" if the designated futures price on the CBOT reaches an agreed threshold.

27.    This is how the "accumulation period" generally works: first, the Accumulator contract specifies a weekly bushel amount, which represents the total quantity of bushels divided by the number of weeks during the period. Thus, if 5,000 bushels are offered for an accumulation period of 25 weeks, then "each week represents 200 bushels to be priced."[2]

---

[1] Stephen D. Johnson, *Accumulator Contracts*, Ag Decision Maker (June 2006), https://www.extension.iastate.edu/agdm/newsletters/nl2006/nljune06.pdf.

[2] *Id.*

28.     The Accumulator contract also specifies a Fixed Sales Price, an Index Contract Price, and a Knock Out Price. The Fixed Sales Price is the price per bushel for which the farmer agrees to sell the grain (plus or minus the basis at the time of delivery). The Index Contract Price refers to a specific futures contract trading on the CBOT. The Knock Out Price is a lower price that triggers termination of the agreement.

29.     The *quantity* of weekly bushels sold under an Accumulator contract is determined weekly by the current Index Contract Price:

    a.  If on a designated day of the week (*e.g.*, Friday) the Index Contract Price remains between the Fixed Sales Price and Knock Out Price, the number of bushels sold that week remains the default volume (200 per week in the example).

    b.  If on the designated day the Index Contract Price is above the Fixed Sales Price, that week's quantity of bushels sold (200 in the example) doubles (to 400).

    c.  If the Index Contract Price ever falls below the Knock Out Price, the contract terminates, and any accumulated bushels remain committed.[3]

30.     This weekly pricing mechanism—tied directly to the futures price—can allow farmers to benefit from price rallies by doubling their sales at the higher price. But it also injects uncertainty into the terms of the contract. Like an HTA, the farmer risks promising to deliver bushels of grain at a price that is lower than the cash price at the time of delivery, but under the Accumulator contract, the quantity is twice the total number of bushels delivered under an HTA or forward contract. Conversely, a farmer who plans to market his or her grain based on the doubling of sold bushels, "may not have those extra bushels sold" in the case that "prices do not

---

[3]  Lisa Elliot, *et al., New generation grain contracts in corn and soybean commodity markets,* Journal of Commodity Markets (Dec. 2020), https://tinyurl.com/fe44ys3r.

hold their rally."[4] The farmer then risks selling those bushels at a spot cash price that is lower than what could have been locked in with a forward or HTA contract.

II.     **COMMODITY FUTURES TRADING AND "BONA FIDE HEDGING"**

31.     Hedging by buying and selling commodities futures is intrinsic to grain merchandising, as a way to offset the various risks associated with grain contracting. The Commodity Futures Trading Commission describes a "hedge" as "a derivative transaction or position that represents a substitute for transactions or positions to be taken at a later time in a physical marketing channel."[5] However, depending on the underlying purpose of the trade, different rules and limitations apply. Anyone who trades on the CBOT is subject to its rules and the regulations issued by the Commodity Futures Trading Commission ("CFTC") pursuant to its statutory authority under the CEA.[6]

32.     Hedgers are primarily individuals and companies in the business related to the particular commodity, like grain elevators and farmers. The CFTC defines "hedger" as a "trader who enters into positions in a futures market opposite to positions held in the cash market to minimize the risk of financial loss from an adverse price change; or who purchases or sells futures

---

[4] Brian Doherty, *Know Your Grain Marketing Contract*, Successful Farming (Feb. 26, 2021), https://www.agriculture.com/markets/analysis/crops/know-your-grain-marketing-contract-analyst-says.

[5] CFTC, *Speculative Limits*, https://www.cftc.gov/IndustryOversight/MarketSurveillance/SpeculativeLimits/speculativelimits.html#P6_864.

[6] *CBOT Rulebook*, CME Group, https://www.cmegroup.com/rulebook/CBOT/ (CBOT Rules); *Commodity Exchange Act & Regulations*, CFTC, https://www.cftc.gov/LawRegulation/CommodityExchangeAct/index.htm

as a temporary substitute for a cash transaction that will occur later."[7] A party "hedges" by taking equal but opposite positions in the cash and futures market.[8]

33.     Speculating on the CBOT is tightly regulated, but hedging is treated differently. Because it is tied to the "cash market" in actual commodities, the CEA exempts "bona fide hedging" from the limits it places on speculative trading. 7 U.S.C. § 6a(2)(A).

34.     Under CFTC regulations, "bona fide hedging" is defined in relevant part as "a transaction or position in commodity derivative contracts in a physical commodity, where":

(1) Such transaction or position:

(i) Represents a substitute for transactions made or to be made, or positions taken or to be taken, at a later time in a physical marketing channel;

(ii) Is economically appropriate to the reduction of price risks in the conduct and management of a commercial enterprise; and

(iii) Arises from the potential change in the value of—

(A) Assets which a person owns, produces, manufactures, processes, or merchandises or anticipates owning, producing, manufacturing, processing, or merchandising;

(B) Liabilities which a person owes or anticipates incurring; or

(C) Services that a person provides or purchases, or anticipates providing or purchasing . . . ."

17 CFR § 150.1.

---

[7] Glossary, CFTC, https://www.cftc.gov/LearnAndProtect/EducationCenter/CFTCGlossary/glossary_s.html.

[8] For example, a farmer "hedges" his grain production or grain in storage by selling an equal volume on the grain futures market (*e.g.* the price of 10,000 bushels of corn in storage can be offset by selling 10,000 bushels of corn futures). By selling futures, the farmer locks in the futures component of local cash pricing. When the grain is later sold at the local cash market price, the farmer immediately buys back the futures position. The net effect of selling grain in the cash market and buying back the position in the futures market is to recover the price existing when the futures were purchased. This is because if market prices fall, the loss in price incurred in the cash market will be exactly offset by the gains made in buying back the futures position at a lower price. Similarly, if market prices rise, the gain made in the cash market will be exactly offset by the loss incurred in buying back the futures position at a higher price.

35.     Such transactions are exempted from speculation limitations if they additionally come under a list of enumerated, approved "bona fide" hedges by the CFTC. 17 CFR § 150.3(1)(i) & Pt. 150, App. A. The common thread throughout the CFTC-approved "bona fide" hedges is their connection to the hedger's business in buying or selling actual grain. For example, the CFTC approves of short positions in commodity derivative contracts, so long as the positions "*do not exceed in quantity the sum of the person's ownership of inventory and fixed-price purchase contracts in the commodity derivative contracts' underlying cash commodity*." *Id.* at App. A(a)(1) (emphasis added).

36.     Elevators and farmers can engage in "bona fide" hedging, provided that, *inter alia*, "[t]he commodity option must be intended to be physically settled, so that, if exercised, the option would result in the sale of an exempt or agricultural commodity for immediate or deferred shipment or delivery." *Id.* at App. A(a)(10) (incorporating the quoted requirements in 17 CFR § 32.3(a)(3)).

37.     Individuals and entities who seek the trade exemption for "bona fide hedge transactions" are required to "keep and maintain complete books and records concerning all details of each of their exemption." *Id.* § 150.3(d).

38.     When commodities trading, including by grain elevators, falls outside the confines of bona fide hedging, it becomes subject to limits on speculative trading imposed by the CEA and CFTC regulations.

39.     As distinguished from a "bona fide" hedger, the CFTC defines "speculator" as follows: "In commodity futures, a trader who does not hedge, but who trades with the objective of

achieving profits through the successful anticipation of price movements."[9] In other words, a speculator is "someone who buys or sells commodities for profit and, *unlike a grain elevator*, their activities are not a normal part of operating a business."[10] Speculators "buy low and sell high (or vice-versa) to make a profit." *Id.* (emphasis added).

40.     To prevent excessive speculation, the CEA directs the CFTC to "establish limits on the amount of positions, as appropriate, *other than bona fide hedge positions*, that may be held by any person with respect to contracts of sale for future delivery or with respect to options on the contracts or commodities traded on or subject to the rules of a designated contract market." *Id.* § 6a(2)(A) (emphasis added). Violations of the CFTC's speculative position limits and related regulations can result in substantial penalties imposed by the agency.[11]

41.     To maintain its status as a bone fide hedger, then, a grain elevator is required to have grain in its possession or under contract in sufficient quantities to satisfy the approved bona fide hedging limits described above and maintain appropriate documents and records to confirm that status.

## III.   DEFENDANTS' RELEVANT CONDUCT

42.     Central States has been operating grain elevators since 1947.  It holds itself out as a "service based business," who "understand[s] that [its] success is based on [its] customers' success and on their growing confidence in [Central States]."

---

[9] Glossary, CFTC, https://www.cftc.gov/LearnAndProtect/EducationCenter/CFTCGlossary/glossary_s.html.
[10] Center for Farm Financial Management, Univ. of Minn. (2013), https://commoditychallenge.com/learn/assets/AAGM/AAGM-Chapter-13.pdf (emphasis added).
[11] *See, e.g., Compliance Take Heed: CFTC Fines Tyson Foods $1.5 Million for Position Limits, Reporting, and Record Keeping Violations*, JD Supra (Sep. 14, 2021), https://www.jdsupra.com/legalnews/compliance-take-heed-cftc-fines-tyson-5335618/.

http://www.centralstatesent.com/about. It further assures its customers: "Our word is our bond[.]" http://www.centralstatesent.com/history.

43.     Starting in 1987, Central States began its grain operation in New Haven, Indiana, About ten years later, it built the Montpelier, Indiana elevator (together, referred to as the "Central States Indiana Division" or "CSE Indiana"). The grain elevator in New Haven has capacity to store nearly 15 million bushels of grain, and the Montpelier, Indiana location can store over 17 million bushels. http://www.centralstatesent.com/locations.

44.     In addition to purchasing grain, Central States also offers financing to some of the producers who sell grain to its Indiana facilities. Farmers enter into those arrangements, with their grain, equipment, their annual crop and even their land pledged as security for the loans. At one point, CSE Indiana had issued $50 million in financing to its grain customers.

**A. Central States' Grain Merchandising**

45.     Central States purchases grain from farmers in all the ways described above, including by using Accumulator contracts.

46.     To memorialize Accumulator contracts with producers, Central States uses a two-page form contract (the "CSE Accumulator"). The base-level information is shown in a box at the top of the contract, with material information about how the key accumulation terms operate included thereafter. A sample CSE Accumulator with Plaintiff Melcher is attached as Exhibit A.

47.     In a box at the top of the CSE Accumulator, the specific terms for delivery, quantity and pricing terms include:

a.      Commodity (*e.g.*, soybeans, corn);

b.      Base Quantity (*e.g.*, 6,500 bushels);

c.      Delivery Location (*e.g.*, CSE New Haven);

d.      Delivery Period (*e.g.*, November 2020);

13

e. Index Contract (*e.g.*, Chicago Board of Trade price SX20, WN21);

f. Fixed Sales Price (*e.g.*, SX20 8.50, WN21 9.00);

g. Knock Out Price (*e.g.*, SX20 8.25, WN21 8.75);

h. Pricing Accumulation Period (*e.g.,* 4/24/2020 through 10/23/2020);

i. Pricing Day (*e.g.,* Friday); and

j. Weekly Bushels (*e.g.*, 200, 250) "which could be doubled up at" (*e.g.*, SX20 8.50, WN21 9.00).

48. This box as it appears in Exhibit A is set forth below. "SX 20" identifies the soybeans futures contract on the CBOT that this CSE Accumulator is tied to.

| BASE QUANTITY AND CONTINGENT ADDITIONAL QUANTITY, GRADE, DELIVERY DATE AND LOCATION, INDEX CONTRACT, PRICING PERIOD, FIXED SALE AND KNOCKOUT PRICE, ADDITIONAL BUSHEL OBLIGATION, BASIS TERMS. | | | |
|---|---|---|---|
| Commodity: Yellow Corn | Delivery Location: CSE - New Haven | | |
| Grade: 2 | Delivery Period: December 2020 | Base Quantity | 220,000 |
| Index Contract: Chicago Board of Trade ("CBOT") | CZ 20 Futures Contract. | | |
| Fixed Sales Price | CZ20 3.51 Per Bu | Pricing Accumulation Period: 6/26/2020 Through | 11/20/2020 |
| Knock Out Price | CZ20 3.19 Per Bu | | Pricing Day: Friday |
| Weekly Bushels: 10000 | Which could be doubled up at | CZ20 3.53 | |
| Contingent Additional Quantity: | Equal to the Base Quantity | | |
| (For use when basis is fixed) | | | |
| Basis: Per Bu | Service Charge: Per Bu | | |
| Date Basis is fixed: | | | |

49. Following this information, the form CSE Accumulator states in fine print how these terms interact, and how actual pricing and quantity will be determined under various scenarios:

k. "For each week that the Index Contract settles on or below the Fixed Sale Price and above the Knock out Price on the Pricing Day, the Seller shall deliver the Weekly Bushel amount during the Delivery Period to the Delivery Location. The Cash Price for each Weekly Bushel obligation shall be the Fixed Sale Price plus or minus the Basis less the Service Charge shown above";

l. "If on any date during the Pricing Accumulation Period the Index Contract trades or settles at or below the Knock out Price, no further obligation for the delivery of Weekly Bushels shall accumulate under this Addendum, but any delivery obligation

for Weekly Bushels already accumulated shall remain. Notwithstanding the
previous sentence, for any Weekly Bushels remaining unpriced due to the Index
Contract trading or settling at or below the Knock out Price, the Seller shall have
the right to establish pricing and delivery terms to be applied to the unpriced bushels
under any bid or contract terms then being offered by the Buyer, so long as pricing
and delivery are complete on or before the Delivery Period. If Seller fails to
establish pricing and delivery terms as so provided, on or before the Delivery
Period, then the price will be Buyer's cash bid on such date and Seller shall make
delivery within five (5) business days thereafter.";

m.  "If on any Pricing Day the Index Contract settles above the Fixed Sale Price, the
Seller shall deliver double the Weekly Bushel amount during the Delivery Period
to the Delivery Location. The Cash Price for each Weekly Bushel obligation shall
be the Fixed Sale Price plus or minus the Basis less the Service Charge shown
above."; and

n.  "The total bushels to be delivered by the Seller shall be the sum of the Weekly
Bushel obligations established during the Pricing Accumulation Period (as priced
under this Addendum), plus any unpriced bushels as addressed within the final two
sentences in Paragraph 4."

50.    At the bottom of the second page of the CSE Accumulator, a warning to the drafter
of the agreement (CSE) states, "[t]his sample form is designed to help outline the general
provisions involved in this kind of transaction. The legality of the specific contracts and the
underlying contract forms in use may change from state to state. . . .and this form may not contain
some specific statements, warnings and language which could be required by state and local
codes."

**B.  The Role of Larry Shepherd**

51.    Larry Shepherd was the face of Central States in Indiana. Mr. Shepherd had been
an employee of Central States for decades, working his way up to Vice President of Operations
for the Indiana Division of Central States, a role that he filled for at least 10 years until he was
fired in late October 2020.

52.    In his role as the Vice President of Indiana Operations, Mr. Shepherd acted on
behalf of Central States, authorizing contracts and lending arrangements between farmers and

Central States, and directing other Central States' employees to do the same. Farmers relied on Mr. Shepherd. Having worked with many of the farmers for years, if not decades, Mr. Shepherd knew the farmers' acreage, bushel capacity and operational history.

53. Mr. Shepherd customarily contracted with farmers for grain delivery through in-person or phone conversations. Grain purchases by elevators like Central States are often initially made orally, with a confirming contract then sent to the selling farmer.

54. His role as Vice President of Indiana Operations also involved grain hedging on behalf of Central States on the CBOT, by buying and selling commodity futures contracts through his accounts with brokers (*e.g.*, FCStone, SOFGEN) on the CBOT to offset the risk associated with grain purchases and sales.

55. Mr. Shepherd also engaged in regular speculative trading on the CBOT on behalf Central States. He would purchase commodity futures in a grain (*e.g.* corn, soybeans) and sell an equal amount of commodity futures in the same grain. The purpose of this speculative trading was to increase Central States' profits.

### i. Speculative Trading by Larry Shepherd

56. Starting in June 2019, Larry Shepherd's speculative trading in grain futures collided with a uniquely volatile grain market, resulting in months of trading losses compounded by Mr. Shepherd's misguided efforts to mitigate those losses. By October 2020, Mr. Shepherd had dug Central States into a deep, speculative hole with the CBOT, requiring Central States to cover vast losses—and, crucially, triggering the unlawful actions that are the subject of this action.

57. In the summer of 2019, Mr. Shepherd was trading futures contracts that had accumulation periods similar to those in the CSE Accumulators between Central States and farmers, except that: as to Mr. Shepherd's futures trading, Central States was obligated to pay for grain bought or to deliver grain sold.

58.     His speculative practice was to purchase grain futures contracts ("Futures Consumers") that contained weekly accumulation provisions, as well as fixed and knock out prices, while offsetting those contracts with the sale of an equal amount of the same grain ("Futures Accumulators") in contracts with matching accumulation provisions, as well as unique fixed and knock out prices.

59.     To illustrate: if Mr. Shepherd bought 10 Futures Consumers for 5,000 bushels of corn on the CBOT, he sold 10 Futures Accumulators for 5,000 bushels of corn.

60.     Just like the Accumulator contracts with farmers, if the futures price went above the fixed price in a Futures Accumulator or below the fixed price in a Futures Consumer, the number of bushels doubled on a weekly basis. Likewise, if the futures price went below the knock out price, the Futures Accumulator terminated, and if the market price went above the knock out price, the Futures Consumer terminated.

61.     In June 2019, Mr. Shepherd was engaged in speculative trading of corn futures. He was selling Futures Accumulators in corn at a high price and buying corn Futures Consumers at a low price.

62.     But the market price in corn began to drop, eventually dropping below the knockout price in Mr. Shepherd's Futures Accumulators—terminating those contracts. Meanwhile, when the price dropped below the fixed price in his Futures Consumers, the amount of futures corn purchases began doubling without an offsetting sale.

63.     Instead of cutting his losses, Mr. Shepherd redoubled, buying more Futures Accumulators and Futures Consumers to cover his original Futures Consumers positions in corn. But the corn market kept dropping, and his Futures Accumulators terminated as the market price

went below the contracted knock-out price, over and again.  All the while the quantity of corn he owned in Futures Consumers kept doubling up under the accumulation provisions.

64.     By the end of 2019, Mr. Shepherd's efforts to mitigate his speculative losses had failed, and Central States was obligated to purchase approximately 8 million bushels of corn at a price that was higher than the market price for corn. To avoid paying up, Mr. Shepherd rolled the contracts to the end of 2020, buying more time on his futures commitments.

65.     Upon information and belief, Central States had to meet broker "margin calls" on Mr. Shepherd's ongoing, weekly trading losses—requiring it to maintain an account with a minimum level of capital, set by the CBOT, to meet the losses reflected in its current positions.

66.     For the first nine months in 2020, the price of corn continued to plummet.[12] To remedy the losses from his corn Futures Consumers, Mr. Shepherd doubled-down on speculative trading and started buying and selling soybean futures—in an attempt to make a profit off soybean sales that could offset the carried-over losses in corn.

67.     Over the course of 2020, Mr. Shepherd was constantly shifting his futures positions in this attempt to generate profit to make up for his 2019 losses.

68.     During this time, Mr. Shepherd was losing as much as $10,000 a week in his speculative trading on the CBOT.

69.     At one point in 2020, Mr. Shepherd had over 100 corn and soybean Futures Accumulators on the CBOT. Upon information and belief, each Futures Accumulator in soybeans had a 5,000 base quantity (10,000 if doubled-up under the accumulation provisions).

---

[12] *Tightening supplies drive prices higher for major U.S. commodities*, U.S. Dept. of Agriculture, https://www.ers.usda.gov/data-products/chart-gallery/gallery/chart-detail/?chartId=100440 (chart showing corn prices declining from January to September 2020)

70.     Upon information and belief, his speculative trading led to at least one commodity broker terminating the Futures Accumulators he had purchased on the CBOT.

71.     None of Mr. Shepherd's speculative trading was tied to contracts for the delivery of actual grain or grain stored in Central States' elevators, as required under the CFTC rules for the "bona fide" hedging that is exempted from the CEA.

72.     While Central States was pressing Mr. Shepherd on whether he had grain contracts to cover these losses, he kept trying to get out of his speculation hole through more speculation.

73.     Ultimately, Mr. Shepherd's efforts to generate offsetting positions failed. He sold soybean futures before the market price peaked in late 2020.[13]

74.     By July 2020, Mr. Shepherd owned futures positions in a hefty amount of low-value grain.

75.     Once harvest was on the horizon, in late summer 2020, Mr. Shepherd's speculative trading had placed Central States in a position to either deliver huge quantities of grain that it did not have under contract, or to cover those commitments with substantial cash payments. Central States' trading positions would "come due" at harvest, and Mr. Shepherd had nothing close to the extraordinary volume of grain commitments needed from farmers to back up his speculative positions.

76.     Further, if Central States could not demonstrate that it was engaged in "bona fide" hedging—to the end of covering its risks in actual grain—it was facing the possibility of significant financial and other penalties for unlawful speculative trading in violation of CFTC regulations.[14]

---

[13] U.S. Dept. of Agriculture, *supra* (as with corn, soybean prices did not start rising till late 2020).
[14]     *See, e.g.*, Release Number 7754-18, CFTC (July 12, 2018), https://www.cftc.gov/PressRoom/PressReleases/7754-18 (Order and settlement requiring commodity merchandising firm to pay $3.4 million civil monetary penalty and undertake remedial

ii.     **Fraudulent Grain Contracts Between Central States and Farmers**

77.     Having put Central States in this position, Mr. Shepherd embarked on a fraudulent scheme to cover the enormous futures losses by placing farmers into sham contracts—not authorized by the farmers —for the delivery of grain in volumes far exceeding the farmers' annual production capacity.

78.     To "backfill" Central States' grain delivery commitments, Mr. Shepherd unilaterally drafted multiple grain Accumulator contracts that, when "effectuated" according to their terms, would commit the farmers to delivering quantities of grain exceeding their actual annual production capacities (the "Unauthorized Contracts"). He did this with actual knowledge that the grain quantities required under the Unauthorized Contracts far exceeded farmers' grain capacities.

79.     A recent letter sent by the President of Central States, Robert Nawrot, to Plaintiff Melcher exemplifies the impossibility of  Central States' demands. *See* Exhibit B. As shown, Central States demands that Plaintiff Melcher must, *inter alia*, deliver 518,800 bushels of corn in December of this year—an amount that requires over two years of growing. It also requires delivery of 140,100 bushels of wheat (when his capacity is 100,000) and 142,824 bushels of soybeans (when his capacity is 65,000). *Id.*

80.     These Unauthorized Contracts were often back-dated in order to have the effect of committing farmers to the delivery of grain in accumulated volumes needed to meet Central States' obligations. To cover Mr. Shepherd's futures obligations, the Unauthorized Contracts purported

---

measures, in part based on its speculative trading); Release Number 8002-19, CFTC (Sep. 9, 2019), https://www.cftc.gov/PressRoom/PressReleases/8002-19 (Order and settlement requiring payment of $1,250,000 and permanent restrictions on CFTC registration for conduct that included "violating speculative position limits in live cattle futures contracts").

to obligate farmers to delivery quantities of grain vastly exceeding the farmers' production capacity. Indeed, Mr. Shepherd purported to place many farmers into commitments equal to several *years* of their actual production capacity.

81.     As he undertook his scheme, Mr. Shepherd accumulated a substantial physical stack of Unauthorized Contracts with farmers, but did not enter them into Central States' internal system. Mr. Shepherd also maintained a handwritten list of these off-book, fictional grain contracts that purported to cover Central States' unmet grain commitments from his speculative trading.

82.     These Unauthorized Contracts were not agreements for delivery of grain but rather fraudulent representations by Mr. Shepherd of Plaintiff's and other farmers' supposed promises to deliver grain—as evidenced by the impossible grain delivery volumes these sham contracts imposed on the farmers.

83.     As discussed below, because the volumes contemplated by the Unauthorized Contracts vastly exceeded any realistic expectation of the "actual delivery" of grain, they were instead illegal off-exchange commodities contracts, and Mr. Shepherd's purported use of them was illegal as well.

84.     The Unauthorized Contracts rather exemplify Mr. Shepherd's and Central States' fraudulent scheme to cover their impending losses.

85.     Once Mr. Shepherd had put farmers into the Unauthorized Contracts he had created to back up Defendants' futures losses, he next proceeded to misrepresent to farmers that these Unauthorized Contracts were indeed what the farmers had already agreed to.

86.     Mr. Shepherd, having considerable influence through his long-time relationships with these farmers, managed to convince some to "agree" to the Unauthorized Contracts through patently false and misleading representations and by threatening farmers.

87.     As an example, on September 14, 2020, Plaintiff Melcher went to see Mr. Shepherd at his request. At that point, Plaintiff Melcher had contracted with Central States to deliver 14,000 bushels. But in the meeting, Mr. Shepherd told Plaintiff Melcher that he had "put" him in a "bunch" of Accumulator contracts, and claimed that he owed tens of thousands in bushels of corn.

88.     Central States was aware of Mr. Shepherd's speculative trading and its own untenable commitments to deliver grain or pay for his trading losses, as well as Mr. Shepherd's efforts to force farmers into massive and impossible grain delivery quantities to back up those commitments. In exchange for favorable terms upon his resignation, Central States forced these Unauthorized Contracts upon farmers to back up Central States' own obligations.

89.     Mr. Shepherd was terminated by Central States on October 29, 2020, but with a substantial bonus or severance payment.

**C.      Central States' Enforcement of the Unauthorized Contracts**

90.     Since Mr. Shepherd's departure, Central States has attempted to enforce all of the Unauthorized Contracts created by Mr. Shepherd. When faced with objections by farmers, Central States has declined to allow farmers out of the unauthorized and illegal contracts, even though Central States knows that the contracts were unauthorized.

91.     Instead, Central States is aggressively attempting to enforce the terms of the Unauthorized Contracts, including by hiring attorneys to press farmers for payment. When a farmer is unable to deliver the supposedly promised grain, Central States demands a buyout, sometimes in the millions of dollars, to cover Central States' own grain delivery obligations.

92.     Central States is attempting to enforce these Unauthorized Contracts notwithstanding its inability to confirm their legitimacy. It is well-known that Mr. Shepherd solely kept paper records of the effort to cover up his futures losses with fabricated grain agreements.

93.     In a December 2020, Central States shredded a stack of paper documents reflecting Mr. Shepherd's Unauthorized Contracts with farmers.

94.     Despite this evidence that Central States does not actually have contractual authority, and it knows that it doesn't, Central States continues to attempt to enforce the Unauthorized Contracts purporting to obligate farmers to grain delivery terms in excess of farmers' annual production capacity.

95.     Not only does this mean that Plaintiff and Class Members are paying money on the Unauthorized Contracts, they are paying prices that, at least in some cases, are less than what they could get on the market.

96.     For the farmers with financing by Central States, Central States has treated its financing of farmers as dependent on farmers' delivery of impossible bushel amounts (or the monetary equivalent) under the Unauthorized Contracts.

97.     For Plaintiff Melcher, the coercion culminated at the end of December 2020, when Central States forced him to sign new contracts in order to receive a necessary payment under his financing agreement with Central States.

98.     As a result of Mr. Shepherd's fraudulent scheme, the farmers subject to Unauthorized Contracts have suffered severe economic injury from making payments and losing revenue and property under liens by Central States to satisfy fraudulent obligations that were never legally owed; from paying fees and taking additional losses in order to roll the purported contracts forward; and from delivering grain supposedly subject to these illegal agreements at rates less favorable than could have been obtained in the market.

## IV.   DEFENDANTS' VIOLATIONS OF THE COMMODITIES EXCHANGE ACT

99.   The Unauthorized Contracts created by Mr. Shepherd, purporting to require farmers to deliver grain in excess of their annual production abilities, were not exempt from regulation under the Commodities Exchange Act ("CEA") like ordinary cash forward contracts for the delivery of commodities. The Unauthorized Contracts were themselves illegal, off-exchange commodities agreements. The supposed agreements, and Mr. Shepherd's conduct in fabricating them and attempting to bind farmers under them, all on behalf of Central States, violate the CEA.

100.   Central States' violations of the CEA and related regulations give rise to claims for damages by the Plaintiff and Class members.

### A.   CFTC Guidance Regarding Forward Contracts With Embedded Volumetric Optionality

101.   The CEA authorizes the CFTC to promulgate regulations under the CEA and issue guidance as to its application.[15] 7 U.S.C. § 2. On August 13, 2012, the CFTC issued an interpretation regarding whether all forward contracts—like those between elevators and farmers—fall under the CEA's exclusion of contracts and transactions for the "sale of a commodity for future delivery." 7 U.S.C. § 1a(47)(B). Specifically, the CFTC interpretation regards forward contracts with "embedded volumetric optionality." 77 Fed. Reg. 48237, https://www.govinfo.gov/content/pkg/FR-2012-08-13/pdf/2012-18003.pdf. Defined by the CFTC, "embedded volumetric optionality" refers to contractual "variations in delivery amount."[16]

---

[15] The CFTC's interpretation of the CEA receives *Chevron* deference from federal courts. *See Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n*, 233 F.3d 981, 987 (7th Cir. 2000).

[16] *Forward Contracts with Embedded Volumetric Optionality*, CFTC (May 12, 2015), https://www.cftc.gov/sites/default/files/idc/groups/public/@newsroom/documents/file/volumetric_factsheet051215.pdf

The 2012 interpretation recognizes that when certain options are embedded in forward contracts, the embedded options may render the contract subject to the CEA. *Id.*

102.    Under this 2012 interpretation, the CFTC issued seven criteria under which "an agreement, contract, or transaction falls within the forward exclusion from the swap and future delivery definitions, notwithstanding that it contains embedded volumetric optionality."

103.    One of key principles underlying this test is that the contractual optionality must relate to "delivery rather than price." 77 FR at 48238. Thus, optionality that turns on commercial "supply and demand requirements" does not vitiate a contract's status as one for delivery of an actual commodity. *Id.* at 48238-39. As emphasized by the CFTC, the "predominant feature" of forward contracts excluded from the CEA is the "binding, albeit deferred, delivery obligation. It is essential that any embedded option in a forward contract as to volume must not undermine a forward contract's overall purpose." *Id.* at 48238.

104.    This interpretation also focuses on the intent of both parties, emphasizing that excluded forward contracts are "designed to ensure that both parties intend to make or take delivery (as applicable), subject to the relevant physical factors or regulatory requirements, which may lead the parties to deliver more or less than originally intended." 77 FR at 48238.

105.    A few years later—in response to "requests from market participants"—the CFTC issued another interpretation, primarily to "clarify" when "an agreement, contract, or transaction with embedded volumetric optionality would be considered" an excluded  forward contract. 80 Fed. Reg. 28239-40, *available at* https://tinyurl.com/2jv8ynzz.

106.    The CFTC's final interpretation thus holds that a contract or transaction with "embedded volumetric optionality," will be excluded from the CEA "swap" definition (and thus, its authority) where all of the following factors are met:

1.   The embedded optionality does not undermine the overall nature of the agreement, contract, or transaction as a forward contract;

2.   The predominant feature of the agreement, contract, or transaction is actual delivery;

3.   The embedded optionality cannot be severed and marketed separately from the overall agreement, contract, or transaction in which it is embedded;

4.   The seller of a nonfinancial commodity underlying the agreement, contract, or transaction with embedded volumetric optionality intends, at the time it enters into the agreement, contract, or transaction to deliver the underlying nonfinancial commodity if the embedded volumetric optionality is exercised;

5.   The buyer of a nonfinancial commodity underlying the agreement, contract or transaction with embedded volumetric optionality intends, at the time it enters into the agreement, contract, or transaction, to take delivery of the underlying nonfinancial commodity if the embedded volumetric optionality is exercised;

6.   Both parties are commercial parties; and

7.   The embedded volumetric optionality is primarily intended, at the time that the parties enter into the agreement, contract, or transaction, to address physical factors or regulatory requirements that reasonably influence demand for, or supply of, the nonfinancial commodity.

80 FR at 28241.

107.   This 2015 "clarification" primarily sought to make clear that, under the seventh factor, "the embedded volumetric optionality must *primarily be intended as a means of assuring a supply source or providing delivery flexibility in the face of uncertainty regarding the quantity of the nonfinancial commodity* that may be needed or produced in the future, consistent with the purposes of a forward contract." *Id.* (emphasis added). It clarified that, when evaluating intent under the seventh factor, the "focus" is "the intent of the party with the right to exercise the embedded volumetric optionality at the time of contract initiation." 80 FR at 28241-2.

26

108. As to the seventh factor's reference to "physical factors" that influence demand or supply of a commodity, the CFTC advised that this element *is not met* "if the embedded volumetric optionality is primarily intended, at contract initiation, to address concerns about price risk (*e.g.*, to protect against increases or decreases in the cash market price) . . . ." 80 FR at 28242.

109. As stated in the 2012 CFTC interpretation, to be exempted from the CEA, the optionality in the contract must be triggered by "physical factors or regulatory requirements that influence supply and demand and that are outside the parties' control" such that "the optionality is a commercially reasonable way to address uncertainty associated with those factors." 77 FR at 48238.

**B.  Under the CFTC Guidance, the Unauthorized Contracts Are Subject to the CEA**

110. The Unauthorized Contracts with farmers contain "embedded volumetric optionality" that undermines (indeed, vitiates) the contracts' nature as forward contracts and were primarily intended to serve Mr. Shepherd's effort to minimize his futures losses by accumulating supposed grain delivery obligations to Central States. Thus, the Unauthorized Contracts are futures contracts—not exempted forward contracts—and governed by the Commodities Exchange Act.

111. Here, the accumulation provision—the "doubling up" feature—of the Unauthorized Contracts with farmers inserts "embedded volumetric optionality" into these supposed contracts for sale of grain. However, the optionality does not meet the CFTC seven factor test: namely, it fails on the first, second, fifth and seventh factors.

112. Under the first factor, the accumulation provision of the Unauthorized Contracts *does* undermine the nature of the agreement as a forward contract, because it results in annual grain quantities that the farmers literally cannot meet. In some cases, the grain amounts are equivalent to several years' worth of farmers' annual grain production.

27

113.    Under the second factor, the impossible grain quantity terms in the Unauthorized Contracts mean that the predominant feature could not possibly be "actual delivery," thus failing this element

114.    Under the fifth factor, Mr. Shepherd created the Unauthorized Contracts to cover his futures losses on the CBOT and not to ensure actual delivery.

115.    Finally, under the seventh factor, the accumulation provisions in the Unauthorized Contracts were primarily intended by Mr. Shepherd to offset Central States' futures losses, not to "address physical factors or regulatory requirements that reasonably influence demand for, or supply of" grain.

116.    Under the 2015 CFTC interpretation, the seventh factor requires that the accumulation provisions in the Unauthorized Contracts be "primarily [ ] intended as a means of assuring a supply source or providing delivery flexibility," an intent that is belied by the grain quantities resulting from the accumulation provisions, quantities that could not be met under any circumstances. The true intent underlying these Unauthorized Contracts was to save Mr. Shepherd from his irresponsible speculation on the CBOT, entirely divorced from farmers' grain production capacities.

117.    Because Mr. Shepherd did not trade the Unauthorized Contracts on the CBOT, but rather treated them like cash forward sales with farmers, they are "illegal off-exchange" futures contracts under the CEA. *See, e.g., Cary Oil Co. v. MG Ref. & Mktg., Inc.*, 257 F. Supp. 2d 751, 758 n. 1 (S.D.N.Y. 2003).

118.    Further, because the Unauthorized Contracts are not excluded from coverage by the CEA, the conduct of Mr. Shepherd and Central States in advising farmers about the contracts, and the fraud and misrepresentation of Mr. Shepherd and Central States in creating, imposing and

enforcing the contracts, are all subject to the provisions of the CEA and CFTC regulations prohibiting such conduct and providing a remedy for any damages it has caused.

### C.  Damages Claims For Transactions Violating the Commodities Act

119.    Section 22 of the CEA provides that "[a]ny person who violates this chapter or who willfully aids, abets, counsels, induces, or procures the commission of a violation of this chapter shall be liable for actual damages resulting from one or more of the transactions referred to in subparagraphs (A) through (D) of this paragraph and caused by such violation to any other person":

(A) who received trading advice from such person for a fee;

(B) who made through such person any contract of sale of any commodity for future delivery (or option on such contract or any commodity) or any swap; or who deposited with or paid to such person money, securities, or property (or incurred debt in lieu thereof) in connection with any order to make such contract or any swap;

(C) who purchased from or sold to such person or placed through such person an order for the purchase or sale of--

(i) an option subject to section 6c of this title (other than an option purchased or sold on a registered entity or other board of trade);

(ii) a contract subject to section 23 of this title; or

(iii) an interest or participation in a commodity pool; or

(iv) a swap; or

(D) who purchased or sold a contract referred to in subparagraph (B) hereof or swap if the violation constitutes--

(i) the use or employment of, or an attempt to use or employ, in connection with a swap, or a contract of sale of a commodity, in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative device or contrivance in contravention of such rules and regulations as the Commission shall promulgate by not later than 1 year after July 21, 2010; or

(ii) a manipulation of the price of any such contract or swap or the price of the commodity underlying such contract or swap.

7 U.S.C. § 25(a)(1).

120.     The CEA defines "contract of sale" to include "sales, agreements of sale, and agreements to sell," *id.* § 1a(13), and it defines "future delivery" to exclude "any sale of any cash commodity for deferred shipment or delivery." *Id.* § 1a(27).

121.     The CEA defines "swap" to include, *inter alia*, "any agreement, contract or transaction":

> "that is a put, call, cap, floor, collar, or similar option of any kind that is for the purchase or sale, or based on the value, of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind";

> and

> "that provides for any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence."

*Id.* §§ 1a(47)(A)(i), (ii).

122.     The CEA excludes from the definition of "swap" any "contract of sale of a commodity for future delivery (or option on such a contract)" and "any sale of a nonfinancial commodity or security for deferred shipment or delivery, so long as the transaction is intended to be physically settled . . . ." *Id.* § 1a(47)(B)(i), (ii).

123.     The CEA's general "restrictions on futures trading" provides:

> Unless exempted by the Commission . . . it shall be unlawful for any person to offer to enter into, to enter into, to execute, to confirm the execution of, or to conduct any office or business anywhere in the United States, its territories or possessions, for the purpose of soliciting or accepting any order for, or otherwise dealing in, any transaction in, or in connection with, a contract for the purchase or sale of a commodity for future delivery (other than a contract which is made on or subject to the rules of a board of trade, exchange, or market located outside the United States, its territories or possessions) unless—

> > (1) such transaction is conducted on or subject to the rules of a board of trade which has been designated or registered by the Commission as a contract market or derivatives transaction execution facility for such commodity;

(2) such contract is executed or consummated by or through a contract market; and

(3) such contract is evidenced by a record in writing which shows the date, the parties to such contract and their addresses, the property covered and its price, and the terms of delivery: Provided, That each contract market or derivatives transaction execution facility member shall keep such record for a period of three years from the date thereof, or for a longer period if the Commission shall so direct, which record shall at all times be open to the inspection of any representative of the Commission or the Department of Justice.

*Id.* § 6(a).

124.     Thus, contracts "for the purchase or sale of a commodity for future delivery" not "conducted on or subject to the rules of a board of trade" are "illegal off-exchange" contracts. *See, e.g.*, *Cary Oil Co*, 257 F. Supp. 2d at 758 n. 1.

125.     The CEA prohibits "contracts designed to defraud or mislead," stating that "it shall be unlawful":

(1) for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person; or

(2) for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or swap, that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market—

(A) to cheat or defraud or attempt to cheat or defraud the other person;

(B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record;

(C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person; … .

*Id.* § 6b(a).

126.     Regulations promulgated by the Commodity Futures Trade Commission, who has regulating authority over the CEA, further provide that, "[i]t shall be unlawful for any person directly or indirectly":

(a) To cheat or defraud or attempt to cheat or defraud any other person;

(b) To make or cause to be made to any other person any false report or statement thereof or cause to be entered for any person any false record thereof;

(c) To deceive or attempt to deceive any other person by any means whatsoever in or in connection with an offer to enter into, the entry into, the confirmation of the execution of, or the maintenance of, any commodity option transaction.

17 C.F.R. § 33.10.

**D. Damages Claims For Violating Commodities Trading Advisor Regulations**

127.     Under CFTC regulations, a "Commodities Trading Advisor" means "any person who, for compensation or profit, engages in the business of advising others, either directly or through publications, writings or electronic media, as to the value of or the advisability of trading in any  contract of sale of a commodity for  future delivery, security futures product, [] swap" or other related transactions. 17 CFR § 1.3.

128.     Under 7 U.S.C. § 6m, it is unlawful for a Commodities Trading Advisor to engage in the business of advising others if they are not registered with the CFTC. The CFTC has, in turn, delegated the responsibility of the registration of Commodities Trading Advisors to the National Futures Association ("NFA"). 17 CFR § 3.2(a).

129.     A person is exempt from registration as a Commodity Trading Advisor if "[i]t is a dealer, processor, broker, or seller in cash market transactions of any commodity (or product thereof) and the person's commodity trading advice is solely incidental to the conduct of its cash market business." 17 CFR § 4.14(a)(1). However, for purposes of this section, "cash market

transactions" shall not include "transactions involving contracts for the purchase or sale of a commodity for future delivery." 17 CFR § 4.14(b).

130.    Thus, a grain elevator or its employee that directly advises others as to the value of or the advisability of trading in any contract of sale of a commodity for future delivery, security futures product, or swap is a Commodity Trading Advisor under the CEA if the advice is given for "compensation or profit." The grain elevator or employee is not exempt from registration as a participant in "cash market transactions," because by definition the conduct involves "contracts for the purchase or sale of a commodity for future delivery."

131.    A grain elevator or its employee, like any person, is prohibited by the CEA from providing advice as a Commodity Trading Advisor if it is not registered under the CEA and CFTC regulations, in accordance with the approved rules of the NFA.

132.    Further, as a Commodity Trading Advisor, such an elevator and its employee would be subject to the CEA's prohibition of fraud or misrepresentation:

> It shall be unlawful for a commodity trading advisor, associated person of a commodity trading advisor, commodity pool operator, or associated person of a commodity pool operator, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly. . . to employ a device, scheme, or artifice to defraud any client or participant or prospective client or participant; or . . . to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

7 U.S.C. § 6o.

## CLASS ALLEGATIONS

133.    Plaintiff brings this action on behalf of himself and as a Class action under Rule 23(a) and (b)(3), seeking relief on behalf of the following Class ("Class"):

> All persons who were placed into one or more grain accumulator contracts during 2020 with Central States Enterprises that, individually or in the aggregate or when combined with other grain contracts, purport to require the person to deliver grain to Central States Enterprises in an amount exceeding the person's annual production capacity.

134.   The Class is so numerous that joinder is impracticable.

135.   The claims of the Plaintiff are typical of the claims of members of the Class.

136.   There are questions of law and fact common to the Class that predominate over any individual issues. Those common issues include, but are not limited to:

a. Whether the Central States' Unauthorized Contracts are subject to regulation under the CEA;

b. Whether Central States' Unauthorized Contracts are illegal off-exchange contracts under the CEA;

c. Whether Central States' conduct constituted the solicitation and/or enforcement of "contracts designed to defraud or mislead" under the CEA;

d. Whether Central States' Unauthorized Contracts were secured through fraud or misrepresentation and subject to rescission;

e. Whether Central States' Unauthorized Contracts are void or voidable by farmers because they violate the CEA;

f. Whether Defendants made fraudulent misrepresentations to induce farmers to enter into agreements for the delivery of quantities of grain that Central States knew exceeded the farmers' annual production;

g. The amount by which the farmers were damaged by Defendants' conduct and violations of law;

h. Whether Defendants were unjustly enriched by their unlawful conduct;

i. The amount by which Defendants were unjustly enriched at the expense of farmers.

137.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without duplication of effort and expense that numerous, separate individual actions, or repetitive litigation, would entail. The Class is readily definable and is one for which relevant information should exist in Central States' files. Class treatment will also permit the adjudication of claims by many Class Members who otherwise could not afford to litigate the claims alleged

herein. This class action presents no difficulties of management that would preclude its maintenance as a class action.

138.    Plaintiff will fairly and adequately protect the interests of the Class Members. Plaintiff has no interests adverse to the interests of absent Class Members, and he has retained competent counsel with extensive experience in class action litigation.

**COUNT I**
**Fraud by Misrepresentation or Omission of Material Facts In Connection with Solicitation, Maintenance or Execution of Commodities Futures Transactions**

**Violations of the CEA, 7 U.S.C. § 6b(a)(i) and (iii)**
**<u>On behalf of Plaintiff and the Class</u>**

139.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

140.    The Unauthorized Contracts created and enforced by Defendants Central States and Larry Shepherd are "illegal off-exchange contracts" under the Commodities Exchange Act, because they contain "embedded volumetric optionality" that improperly render them futures contracts under CFTC guidance.

141.    The Unauthorized Contracts do not meet the CFTC advisory test for excluded forward contracts with "embedded volumetric optionality."

142.    Because the Unauthorized Contracts are not exempted forward contracts, they are governed by the CEA and therefore, are illegal futures contracts for failing to be "conducted on or subject to the rules of a board of trade."

143.    The Unauthorized Contracts arising from Mr. Shepherd's fraudulent scheme are sham documents.

144.    Mr. Shepherd and Central States made false, misleading and coercive statements in connection with the creation of the Unauthorized Contracts and in their attempts to secure Plaintiff's and Class members' agreement to and payments under the Unauthorized Contracts.

145.    Mr. Shepherd and Central States violated the CEA by creating, soliciting, attempting to secure agreement to, and enforcing illegal "contracts designed to defraud or mislead."

146.    Central States and Mr. Shepherd knew or recklessly disregarded the fact that the representations made in the Unauthorized Contracts were false and misleading or had no reasonable basis in fact.

147.    Central States and Mr. Shepherd knew or recklessly disregarded the fact that the representations made in soliciting and attempting to solicit Plaintiff's and Class members' agreement to the terms of the Unauthorized Contracts were false and misleading or had no reasonable basis in fact.

148.    At all times relevant to the creating, soliciting and enforcing of the Unauthorized Contracts, Larry Shepherd acted as an authorized agent of Central States.

149.    Central States and Larry Shepherd willfully aided, abetted, counseled, induced and/or procured one another's violations of the CEA and related regulations as set forth herein.

150.    As a direct and proximate result of Defendants' violations, Plaintiff and Class members have suffered economic and other damage directly resulting from Defendants' unlawful creation, solicitation and enforcement of the Unauthorized Contracts.

**COUNT II**
**Unlawful Engagement in Illegal Off-Exchange Fictitious Sales of Grain**

**Violation of the CEA, 7 U.S.C. § 6c(a)**
**On behalf of Plaintiff and the Class**

151.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

152.    The Unauthorized Contracts solicited and enforced by Defendants Central States and Larry Shepherd are "illegal off-exchange contracts" under the Commodities Exchange Act, because they contain "embedded volumetric optionality" that renders them futures contracts under CFTC guidance.

153.    The Unauthorized Contracts do not meet the CFTC test for excluded forward contracts with "embedded volumetric optionality."

154.    Because the Unauthorized Contracts do not meet the CFTC test for exempted forward contracts with embedded volumetric optionality, they are governed by the CEA and therefore, are illegal futures contracts for failing to be "conducted on or subject to the rules of a board of trade."

155.    The Unauthorized Contracts arising from Mr. Shepherd's fraudulent scheme are sham documents that were not assented to by Plaintiff and Class members and contain quantity terms that are not possible in reality.

156.    The Unauthorized Contracts are "fictitious sales" under the CEA. § 6c(a)(2)(A)(ii).

157.    Because Central States has used the Unauthorized Contracts—"fictitious sales"—to offset Mr. Shepherd's speculative futures trading, it has engaged in conduct prohibited by the CEA.

158.    Central States and Mr. Shepherd knew or recklessly disregarded the fact that the Unauthorized Contracts are sham documents that do not reflect actual agreements with Plaintiff and Class Members.

159.    At all times relevant to the creating, soliciting and enforcing of the Unauthorized Contracts, Larry Shepherd acted as an authorized agent of Central States.

160.    Central States and Larry Shepherd willfully aided, abetted, counseled, induced and/or procured one another's violations of the CEA and related regulations as set forth herein.

161.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and Class Members have suffered economic and other damage directly resulting from Defendants' unlawful creation, solicitation and enforcement of the unauthorized contracts.

**COUNT III**
**Fraud by a Commodities Trade Advisor Employing a Device, Scheme Or Artifice or In The Course of a Transaction, Practice or Course of Business**

**Violation of the CEA, 7 U.S.C. §§ 6m and o**
**<u>On behalf of Plaintiff and the Class</u>**

162.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

163.    The Unauthorized Contracts solicited and enforced by Defendants Central States and Larry Shepherd are "illegal off-exchange contracts" under the Commodities Exchange Act, because they contain "embedded volumetric optionality" that improperly render them futures contracts under CFTC guidance.

164.    The Unauthorized Contracts do not meet the CFTC test for excluded forward contracts with "embedded volumetric optionality."

165.    Because the Unauthorized Contracts do not meet the CFTC test for exempted forward contracts with embedded volumetric optionality, they are governed by the CEA and

therefore, are illegal futures contracts for failing to be "conducted on or subject to the rules of a board of trade."

166.    The Unauthorized Contracts were "contracts of sale of a commodity for future delivery, security futures product, [] swap" or other related transactions under 17 CFR § 1.3.

167.    In their communications and transactions with Plaintiff and Class members for or related to the Unauthorized Contracts, Central States and Larry Shepherd acted as Commodities Trading Advisors because, for compensation or profit, they engaged in the business of advising others, as to the value of or the advisability of trading in any contract of sale of a commodity for future delivery, security futures product, [] swap" or other related transactions.

168.    Central States and Larry Shepherd are not registered as Commodities Trading Advisors, and their conduct in advising Plaintiff and Class members concerning the value of entering into, executing or ratifying the Unauthorized Contracts is unlawful under 7 U.S.C. § 6m. Central States and Larry Shepherd are not exempt from registration because their conduct in advising Class members concerning the value of entering into, executing or ratifying the Unauthorized Contracts was not solely incidental to the conduct of Central States' cash market business, and because the purported transactions involved the purchase or sale of a commodity for future delivery. 17 CFR § 4.14(b).

169.    In their communications and transactions with Plaintiff and Class members related to the Unauthorized Contracts, Central States and Larry Shepherd used the mails or other means or instrumentality of interstate commerce, to directly or indirectly to: (i) employ a device, scheme, or artifice to defraud a client or participant or prospective client or participant; and (ii) engage in transactions, practices, or courses of business which operate as a fraud or deceit upon any client or participant or prospective client or participant

39

170.     At all times relevant to the creating, soliciting and enforcing of the Unauthorized Contracts, Larry Shepherd acted as an authorized agent of Central States.

171.     Central States and Larry Shepherd willfully aided, abetted, counseled, induced and/or procured one another's violations of the CEA and related regulations as set forth herein.

172.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and Class Members have suffered economic and other damage caused by Defendants' communications and transactions with Plaintiff and Class members related to the Unauthorized Contracts.

**COUNT IV**
**Rescission Under the Uniform Commercial Code**
**On behalf of Plaintiff and the Class**

173.     Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

174.     The Unauthorized Contracts regard "transactions in goods," and therefore, are governed by the Indiana Uniform Commercial Code ("UCC"). Ind. Code § 26-1-2-102, *et seq.*

175.     The UCC defines "goods" to include the "crops" that are the subject matter of the Unauthorized Contracts. Ind. Code §§ 26-1-2-105; 26-1-2-107.

176.     The Unauthorized Contracts are sham documents created by Mr. Shepherd and Central States to cover grain delivery commitments and financial losses incurred through speculative trading on the CBOT, as described in paragraphs 51-97.

177.     Plaintiff and Class members never lawfully agreed to the terms of the Unauthorized Agreements, terms which include delivery of grain amounts that far exceed the production capacities of Plaintiff and Class members.

178.     Central States and Larry Shepherd deceived or attempted to deceive Plaintiff and members of the Class by falsely representing that Unauthorized Contracts were lawful agreements

imposing obligations on the Plaintiff and members and permitting Central States to enforce those sham obligations.

179.    Thus, Central States made and continues to make material misrepresentations of "past [and] existing facts" to gain a benefit. *Rice v. Strunk*, 670 N.E.2d 1280, 1289 (Ind. 1996).

180.    Defendants Central States and Larry Shepherd solicited Plaintiff and Class members to "agree" to the Unauthorized Contracts and enforced the sham contracts against Plaintiff and Class members knowing that they were not lawful agreements, or with reckless indifference to their falsity. *Id.*

181.    Central States and Larry Shepherd made false or misleading representations to induce and coerce Plaintiff and Class Members to agree to the terms of the Unauthorized Contracts, as detailed in paragraphs 51-97.

182.    Plaintiff and Class Members who have contracted with Central States and Larry Shepherd for years, even decades, justifiably relied on the misleading and false statements when agreeing to the Unauthorized Contracts. *Id.*

183.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and Class Members have suffered economic and other damage directly related to Defendants' unlawful solicitation and enforcement of the Unauthorized Contracts. *Id.*

184.    At all times relevant to the creating, soliciting and enforcing of the Unauthorized Contracts, Larry Shepherd acted as an authorized agent of Central States.

185.    Central States and Larry Shepherd willfully aided, abetted, counseled, induced and/or procured one another's conduct related to the claims herein.

186.    Under the UCC, Plaintiff and Class Members are entitled to rescission and to a return of the status quo, as well as other available remedies, based on Defendants' fraud in the inducement, as described herein. Ind. Code § 26-1-2-721

**COUNT V**
**Unjust Enrichment**
**On behalf of Plaintiff and the Class**

187.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

188.    By means of Central States' solicitation and enforcement of the Unauthorized Contracts, Central States received from Plaintiff and Class members monetary funds and actual bushels of grain at quantities and prices not authorized under contract or law.

189.    Central States knowingly received and retained wrongful benefits and funds from Plaintiff and Class members. In so doing, Central States acted with conscious disregard for the rights of Plaintiff and members of the Class.

190.    The benefits received by Central States from the Plaintiff and Class members were expressly or impliedly requested by Central States.

191.    As a result of Central States' wrongful conduct, it has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and members of the Class.

192.    Central States' unjust enrichment is traceable to, and resulted directly and proximately from, its solicitation and enforcement of the Unauthorized Contracts.

193.    Under the common law doctrine of unjust enrichment, it is inequitable for Central States to retain the benefits it received, and is still receiving, without justification. Its retention of such benefits under circumstances making it inequitable to do so constitutes unjust enrichment.

194.    The actual commodities and financial benefits retained by Central States rightfully belong to Plaintiff and members of the Class. Central States should be compelled to disgorge into

a constructive trust an amount equal to the benefits it has retained for the benefit of Plaintiff and members of the Class.

195.    Plaintiff and members of the Class have no adequate remedy at law.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff and the Class demand judgment against the Defendants and each of them as follows:

A.    For an order certifying this lawsuit as a Class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, designating Plaintiff as Class representatives, and appointing Plaintiff's counsel as counsel for the Class;

B.    For an award of all damages to Plaintiff and the Class resulting from Defendants' violations of the CEA as alleged herein;

C.    For an award of restitution to remedy Defendants' unjust enrichment at the Plaintiff and Class Members expense as alleged herein;

D.    For a declaration that the Unauthorized Contracts are the result of fraud or misrepresentation, are unenforceable, and are subject to rescission;

E.    For a determination and award of the payments required by Defendants to restore Plaintiff and the Class to their position prior to Central States' creation and attempt to enforce the Unlawful Contracts;

F.    For an award of punitive damages for the fraud, misrepresentation and other unlawful intentional acts committed by Defendants at Plaintiff's and Class Members' expense;

G.    For an award of reasonable attorneys' fees and expenses, as provided by law; and

H.    For all other just and proper relief.

## JURY DEMAND

Plaintiff, by counsel, demands trial by jury on all eligible claims.

Dated: <u>November 2, 2021</u>                           Respectfully submitted,

*/s/ Scott D. Gilchrist*
Richard E. Shevitz (#12007-49)
Scott D. Gilchrist (#16720-53)
Natalie A. Lyons (#36583-32)
COHEN & MALAD LLP
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Telephone: (317) 636-6481
Fax: (317) 636-2593
rshevitz@cohenandmalad.com
sgilchrist@cohenandmalad.com
nlyons@cohenandmalad.com

John J. Schwarz, II (#25783-44)
SCHWARZ LAW OFFICE, PC
310 North Chicago Street
P.O. Box 637
Royal Center, IN 46978
Telephone: 574-643-9999
Fax: 574-643-9994
john@schwarzlawoffice.com

**Counsel for Plaintiff and the
Proposed Class**