UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| DAVID MELCHER, on behalf of himself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> CENTRAL STATES ENTERPRISES, LLC AND LARRY SHEPHERD <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) )    CASE NO.1:21 CV 409 HAB-SLC |

## OPINION AND ORDER

David Melcher ("Melcher"), a farmer cultivating soybeans, corn, and wheat, filed this class action suit against Defendants, Central States Enterprises, LLC ("Central States") and its then Vice President of Operations, Larry Shepherd ("Shepherd"), asserting that they created and enforced fictitious contracts requiring Melcher and others to deliver grain quantities beyond their grow capacities. Melcher further claims that the motivation for Defendants' conduct came from financial losses Shepherd suffered in speculative trading on the commodities futures market. He brings suit for violating multiple provisions of Section 6 of the Commodities Exchange Act (CEA) as well as equitable state law claims for rescission and unjust enrichment. (Compl., ECF No. 1).

Before the Court is Central States Motion to Dismiss, or in the alternative, to Stay and Compel Arbitration. (ECF No. 16), to which Shepherd joined (ECF No. 19). Over a month after the motion was fully briefed (ECF Nos. 17, 29, 34, 35), Melcher moved to strike "new evidence and arguments" raised in Defendants' reply. (ECF No. 36). That motion is also fully briefed and ripe for consideration. (ECF Nos. 37, 41, 42, 45). Because the Court cannot determine under the

long and complex record whether a valid agreement to arbitrate exists between the parties, the Defendants' Motion to Dismiss or Compel Arbitration will be DENIED and the issue will proceed to summary trial pursuant to Federal Arbitration Act §4. The Plaintiff is granted leave to file an amended complaint consistent with this Opinion and Order. The Motion to Strike is DENIED. A pretrial conference will be set by separate entry.

## DISCUSSION

1. *Legal Standard*

As discussed above, the Defendants' motion seeks dismissal under Fed. R. Civ. P. 12(b)(6) or for the Court to stay the action and compel arbitration under Sections 3 and 4 of the Federal Arbitration Act (FAA). 9 U.S.C. §§ 3, 4. Under the FAA, if "the parties have an arbitration agreement and the asserted claims are within its scope," the court must compel arbitration and stay the case. *Lathan v. Uber Techs., Inc.*, 266 F. Supp. 3d 1170, 1173 (E.D. Wis. 2017) (citing *Sharif v. Wellness Int'l Network, Ltd.*, 376 F.3d 720, 726 (7th Cir. 2004)); *see also Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1985). While "[t]he FAA does not expressly identify the evidentiary standard a party seeking to avoid compelled arbitration must meet[,] ... courts that have addressed the question have analogized the standard to that required of a party opposing summary judgment under Rule 56(e) of the Federal Rules of Civil Procedure: the opposing party must demonstrate that a genuine issue of material fact warranting a trial exists." *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735 (7th Cir. 2002) (citing cases); *see also Mohammed v. Uber Techs., Inc.*, 237 F. Supp. 3d 719, 725 (N.D. Ill. 2017); *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 91 (2000). When the parties disagree about the existence of an arbitration agreement, the summary judgment standard supplies the standard of review. *See Tinder*, 305 F.3d at 735. "The court must consider all of the non-moving party's evidence and construe all reasonable inferences

2

in the light most favorable to the non-moving party." *Tickanen v. Harris & Harris, Ltd.*, 461 F. Supp. 2d 863, 866 (E.D. Wis. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (citation omitted). If a non-movant identifies a material factual dispute about whether the parties agreed to arbitrate, the non-movant is entitled to a jury trial on that issue. 9 U.S.C. § 4 ("If the making of the arbitration agreement ... be in issue, the court shall proceed summarily to the trial thereof."); *Scheurer v. Fromm Fam. Foods LLC*, 863 F.3d 748, 751 (7th Cir. 2017).

Alternatively, the Defendants argue that Melcher's claims should be dismissed for failure to state a claim for relief because Melcher is not a party to the contracts he attached to the Complaint as Exhibit A and he has not plead fraud with particularity under Fed. R. Civ. P. 9(b). The Court's review of this portion of the motion is governed by Fed. R. Civ. P. 12(b)(6). When deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court accepts as true all factual allegations in the complaint and draws all inferences in favor of the plaintiff. *Bielanski v. County of Kane*, 550 F.3d 632, 633 (7th Cir. 2008). The allegations, however, must "give the defendant fair notice of what the...claim is and the grounds upon which it rests," and the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations and quotation marks omitted). Put differently, the complaint must include "enough facts to state a claim to relief that is plausible on its face." *Hecker v. Deere & Co.*, 556 F.3d 575, 580 (7th Cir. 2009) (internal citation and quotation marks omitted). To be facially plausible, the complaint must allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

In cases of alleged fraud, pleading requirements are more stringent. The alleging "party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). The

allegations must contain the "who, what, when, where, and how" of the fraud. *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009). Whether the heightened standard of "particularity" is met depends on the specifics of the case. *Id.* If not met, the motion to dismiss will be granted.

### 2. Factual Background

Melcher is an Indiana farmer growing soybeans, corn, and wheat on 8,500 acres of land in New Haven, Indiana. Central States is a privately held grain elevator operating in Florida and Indiana. Since 1990, Melcher has been selling grain to Central States. At the time of the events set out in the Complaint, Shepherd was the Vice President of Operation for the Indiana Division of Central States.

This case involves the interplay among farmers and grain elevators with the ever-volatile commodities markets. A 44-page Complaint sets out the factual basis for the alleged commodities violations, most of which are irrelevant to the present motions. What is relevant is Melcher's assertion that the Defendants created and enforced certain sham contracts causing him and the putative class members harm. It is to these allegations that the Court now turns its focus.

### A. The Basics

As explained in the Complaint, grain elevators such as Central States purchase, store and sell grain. In its elementary form, elevators purchase grain from farmers and store the grain until end users want to purchase it. Both farmers and grain elevators face risks from price volatility and seek to manage these risks through use of various contracts for purchasing and selling grain and by hedging their risk through buying and selling futures contracts on the Chicago Board of Trade (CBOT). (Compl. ¶¶s 19-21).

The Complaint provides the Court with a primer of common grain contracts and various pricing components reflected in the contracts. Three prices are pertinent here: spot price, futures price, and basis. Spot price is the local cash price set on a given date by the local elevator purchasing the grain. Futures price is the price established on a given date by the applicable board of trade. Basis is the difference between the spot price and the futures price on a given date. (Compl. ¶¶s 22-24).

This case involves two types of contracts: accumulators and hedge to arrive purchase contracts (HTA contracts). Accumulator contracts between farmers and grain elevators correspond to a hedged position taken by the grain elevator on the commodities exchange through a broker. For example, a hedge position is offered by a broker to the elevator in incremental amounts of grain (e.g. 5,000 bushels of corn). In turn, the elevator enters into accumulator contracts with farmers to supply that grain that the elevator has promised to deliver. (Compl. ¶ 25).

An HTA contract is an agreement between the farmer and a grain elevator for the sale of a fixed quantity of grain for future delivery. The contract price is tied to a futures price set at the time of contracting but the basis (the difference between the local cash price/spot price and the futures price) floats until the seller selects a pricing date. (Compl. ¶ 24(c)).

An accumulator contract is much like an HTA in that the grain price is tied to a futures contract price and the basis is determined when a date of delivery is selected. But, as its name suggests, accumulator contracts include an "accumulation period" that corresponds to a timeframe between two specified dates, where the weekly quantity of bushels can "double up" if the designated futures price on the CBOT reaches an agreed threshold.[1] (Compl. ¶ 26).

---

[1] This is a simplified description of accumulator contracts. The specifics, while relevant to Melcher's substantive claims and explained in the Complaint, are not relevant to the present motions.

Central States purchases grain from farmers in some instances using accumulator contracts and HTA contracts. (Compl. ¶ 45). Accumulator contracts are memorialized in a two-page form setting out the material terms including: commodity type, base quantity, delivery location, delivery period, CBOT price, fixed sales price, knock out price[2], pricing accumulation period, pricing day, and weekly bushels potentially subject to "doubling up". (*Id.* ¶¶s 46-47). The interaction between all these terms and the manner of pricing and quantity are set out later in the document. The top of the document states that "[t]his Pricing and Contingent Additional Bushel Delivery Addendum forms a part of the offer contract…" At the end of the document, an italicized warning reads:

> This sample form is designed to help outline the general provisions involved in this kind of transaction. The legality of the specific contracts and the underlying contract forms in use may change from state to state and region to region, and this form may not contain some specific statements, warnings and language which could be required by state and local codes…

(*Id.* ¶¶s 49-50). Melcher attached to the Complaint what he terms a "sample" accumulator contract between him and Central States. (Compl., ECF No. 1-1, Ex. A).

### B. Allegations Specific to the Defendants

Defendant Shepherd, a long-time employee of Central States and its Vice President of Indiana Operations, contracted with farmers for grain delivery through in-person and telephone conversations. (Compl. ¶ 53). Customarily in the industry, grain purchases are often first made orally, with a confirming contract to follow. (*Id.* ¶54). Together with his interaction with farmers, Shepherd's role included grain hedging for Central States on the CBOT, by buying and selling commodity futures contracts through his broker accounts to offset the risk associated with grain purchases and sales. This included speculative trading on the CBOT to increase Central States' profits. (*Id.* ¶54-55).

---

[2] The "knock out price" is a lower price that triggers termination of the agreement. (Compl. ¶28).

The Complaint alleges that in June 2019, Shepherd's speculative trading got the best of him. Months of trading losses piled up and Shepherd could not mitigate those losses. (Compl. ¶ 56). Shepherd was trading futures contracts that had accumulations periods similar to the accumulations period in the accumulator contracts between Central States and farmers, but because of Shepherd's futures trading, Central States had to pay for grain bought or deliver grain sold. By the end of 2019, Shepherd's losses required Central States to purchase around 8 million bushels of corn at a price higher than the market price for corn. (Compl. ¶ 64). As the price of corn continued to plummet in the first nine months of 2020, Shepherd doubled down on speculative trading and started buying and selling soybean futures. Throughout 2020, Shepherd constantly shifted his futures positions to generate profit to make up for 2019 losses. (Compl. ¶¶65-66). Ultimately, however, his efforts to generate offsetting positions failed and Shepherd owned futures positions in large amounts of low-value grain. By late summer 2022 and with fall harvest looming, Shepherd's trading had put Central States in a position to either deliver huge quantities of grain that it did not have under contract, or to cover those commitments with substantial cash payments.[3] Shepherd did not have grain commitments he needed from farmers to back up his speculative positions. (Compl. ¶¶ 73-76).

And this is where the rubber met the road for Shepherd. Melcher asserts that Shepherd embarked on a fraudulent scheme to cover his future losses. The scheme went something like this: Shepherd placed farmers into sham contracts that they knew nothing about for the delivery of grain in volumes far exceeding these farmers' annual production capacity. The Complaint alleges that Shepherd drafted multiple grain accumulator contracts ("the Disputed Contracts") that, when "effectuated" according to their terms, committed the farmers to delivering grains he knew they

---

[3] Central States was also potentially facing financial penalties for unlawful speculative trading. (Compl. ¶ 76).

could not produce. (Compl. ¶¶ 77-78). The Disputed Contracts were back-dated "to have the effect of committing farmers to the delivery of grain in accumulated volumes needed to meet Central States' obligations." (Compl. ¶ 80).

The Complaint also alleges that Central States was aware of Shepherd's speculative trading and its commitments to deliver grain or pay for trading losses. (Compl. ¶ 88). Central States terminated Shepherd on October 29, 2020. Even so, Central States has continued to enforce the Disputed Contracts. Attached to the Complaint is a demand letter (the Demand Letter) from Central States dated September 22, 2021, notifying Melcher that he has outstanding contracts for corn, soybeans, and wheat. (Compl. ECF No. 1-2, Ex. B).

### C. Additional Facts Related to the Present Motions

#### i. *Defendants' Evidence*

Defendants assert that Melcher agreed to arbitrate this dispute, that the accumulator contract attached to the Complaint is incomplete, and that all accumulator contracts are part of a broader agreement customarily used by Central States. They offer the Declaration of Central States' treasurer, Mark Brickey (Brickey), to provide evidence of Central States' standard practice and procedure for its contractual process. (Brickey Decl., ECF No. 17-1). Brickey declares that accumulator contracts, like the one in the Complaint, are tied to a broader agreement that includes one or more HTA contracts. (*Id.* ¶ 7). The HTA contract, Brickey states, includes an arbitration clause that reads: "[I]n the event of a dispute arising hereunder, the parties agree to submit the dispute to the National Grain & Feed Association Trade Rules and/or Arbitration Rules." (*Id.* ¶ 8). He also asserts that the arbitration clause is present in all HTA contracts entered into by Central States.

In their reply brief, the Defendants present more evidence – the Supplemental Declaration of Brickey and 528 pages of attached documents they assert constitute nine contracts that prompted the Demand Letter. In his supplemental declaration, Brickey states that the sample accumulator contract attached to the Complaint is not one of the contracts that spawned the Demand Letter Central States sent to Melcher. (Supp. Brickey Decl., ECF No. 34-1, ¶ 7). He also states that these nine contracts now produced are the "Disputed Contracts" and that each of them has corresponding HTA contracts signed by Melcher accompanying them that contain the arbitration language. (*Id.* ¶¶*s* 15-17).

A review of these documents shows accumulator contracts between Advance Grain and Central States dated 7/31/2020 (ECF No. 34-4 at p. 2); 8/7/2020 (ECF No 34-5 at pp. 2-3) (no initials or signature pages); 9/14/2020 (ECF No. 34-6 at pp. 2-3) (no initials or signature pages); 7/3/2020 (ECF No. 34-7 at pp. 2-3); 7/17/2020 (ECF No. 34-8 at pp. 2-3); 7/24/2020 (ECF No. 34-9 at p. 1)( (no initials or signature pages); 7/31/2020 (ECF No. 34-10 at pp. 2-3) (no initials or signatures); 8/14/2020 (ECF No. 34-10); 8/7/2020 (ECF No. 34-12 at pp. 2-4). As shown, some contain signatures and initials purportedly from Melcher. Some do not. Attached to these documents are HTA contracts purportedly signed by Melcher – all containing the arbitration provision set out by Brickey in his original declaration.[4]

  ii.  *Plaintiff's Evidence*

In his response to Defendants' motion, Melcher submits his own declaration in which he makes these averments:

- He operates his farming business as a sole proprietorship in the name of "Advance Grain" and thus David Melcher and Advance Grain are the same. (Melcher Decl., ECF No. 29-1, ¶ 3).

---

[4] The dates on many of the HTA Contracts fall outside the accumulation dates in the accumulator contracts. Whether this is pertinent or not cannot be determined by the Court.

9

- Defendants have asserted Ex. A to the Complaint to be an accumulator contract between Advance Grain and Central States dated June 26, 2020. The signature on that document is not his and he does not know about the "Offer Contract No. CZ20 3.53" to which that accumulator says is an addendum. (*Id.* ¶¶s 4-5).

- Defendants have asserted Ex. A attached to the Brickey Declaration to be an accumulator contract between Advance Grain and Central States dated July 31, 2020. The signature on that document is not his and he does not know about the "Offer Contract No. CN21 3.80" to which that accumulator say is an addendum. (*Id.* ¶¶s 6-7),

- As for both Ex. A to the Complaint and Ex. A to the Brickey Declaration, Melcher does not know about any larger or broader agreement. (*Id.*¶¶s 4-7).

After Defendants replied and included Brickey's supplemental declaration and the purported nine contracts that sparked the Demand Letter, Melcher moved to strike those documents and submitted his second declaration in support. (Melcher 2nd Decl., ECF No. 37-1). In that declaration, Melcher states that he did not sign the accumulator contract in ECF No. 34-4 and the signature that does appear is not his (*Id.* ¶ 4). As for the documents in ECF Nos. 34-5, 34-6, 34-9, and 34-10, Melcher asserts that these documents have no signature pages and he did not sign the accumulator contracts. (*Id.*¶'s 5, 6, 10, 11). He submits 37 alleged accumulator contracts that he received from Central States. (ECF No. 37-10). He alleges that he did not agree to any of these 37 accumulator contracts and the signature on the documents are not his. (*Id.* ¶12).

3. Analysis

    a. **Motion to Compel Arbitration**

The Federal Arbitration Act (FAA) "governs the enforcement, validity, and interpretation of arbitration clauses in commercial contracts in both state and federal courts." *Jain v. de Mere*, 51 F.3d 686, 688 (7th Cir. 1995). The FAA was enacted to replace "widespread judicial hostility" to the enforcement of arbitration agreements with "a liberal policy favoring arbitration." *AT & T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011). The FAA thus "sweeps broadly, 'requiring

courts rigorously to enforce arbitration agreements according to their terms.'" *Wallace v. Grubhub Holdings, Inc.*, 970 F.3d 798, 800 (7th Cir. 2020) (quoting *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018)).

To compel arbitration under the FAA, this Court must find "[1] a written agreement to arbitrate, [2] a dispute within the scope of the arbitration agreement, and [3] a refusal to arbitrate." *See Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 690 (7th Cir. 2005). The party opposing arbitration bears the burden of establishing why the arbitration provision should not be enforced. *Green Tree Financial Corp.-Alabama v. Randolph*, 531 U.S. 79, 91 (2000); *Wallace*, 970 F.3d at 803.

To say that this Court has been thwarted in its ability to decide the present motions by the constant changing of the factual playing field between the parties is an understatement. The parties have presented evidence in a piecemeal fashion and made it exceedingly difficult for this Court to grasp what the facts may be. What is clear is that this Court cannot grant Defendants' motion to compel arbitration because whether an agreement to arbitrate exists relating to any of the Disputed Contracts is blurred.

Melcher disputes that there is a valid and enforceable contract between him and Central States that requires arbitration. An agreement to arbitrate is treated like any other contract. *Gibson v. Neighborhood Health Clinics*, 121 F.3d 1126, 1130 (7th Cir. 1997). A party can be forced to arbitrate only matters that he or she has agreed to submit to arbitration, *James v. McDonald's Corp.*, 417 F.3d 672, 677 (7th Cir. 2005), and "[i]f there is no contract there is to be no forced arbitration." *Gibson*, 121 F.3d at 1130. In determining whether a valid arbitration agreement exists between the parties, a federal court should look to the state law that ordinarily governs formation of contracts. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995); *James*, 417 F.3d

11

at 677. Under Indiana law, a valid contract requires offer, acceptance, consideration, and mutual assent. *Ellison v. Town of Yorktown*, 47 N.E.3d 610, 617 (Ind. Ct. App. 2015). "The intention of the parties to a contract is a factual matter to be determined from all the circumstances." *Zimmerman v. McColley*, 826 N.E.2d 71, 77 (Ind. Ct. App. 2005).

The FAA allows arbitration agreements to be declared unenforceable "upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "This saving clause permits agreements to arbitrate to be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability." *AT & T Mobility v, Concepcion*, 563 U.S. 333, 339 (2011) (quotations omitted). "[W]here the dispute at issue concerns contract formation, the dispute is generally for courts to decide." *Granite Rock Co. v. Int'l Bhd. of Teamsters,* 561 U.S. 287, 296 (2010); *see*, *e.g.*, *Deputy v. Lehman Bros., Inc.*, 345 F.3d 494, 514 (7th Cir. 2003) (remanding a case to assess whether there was a meeting of the minds in light of a motion to compel arbitration); *Sphere Drake Ins. Ltd. v. All Am. Ins. Co.*, 256 F.3d 587, 591 (7th Cir. 2001) ("as arbitration depends on a valid contract an argument that the contract does not exist can't logically be resolved by the arbitrator").

Here, while the record contains a lot of bluster, it is remarkable for what it does not contain. The parties have failed to competently address the contract formation issues in this case. Defendants ask this Court to declare a valid, enforceable contract to arbitrate but the record is untidy and disputed. In his Complaint, Melcher asserts that the Defendants created fraudulent accumulator contracts well over his growing capacity and seek to enforce the false agreements against him. Melcher included a sample accumulator contract in his Complaint. That sample, on its face, does not contain any obligation to arbitrate. In its motion seeking to compel arbitration, Defendants assert that the sample accumulator contract is not the complete contract between the

parties. Rather, they assert that Melcher signed the accumulator contracts and the corresponding HTA contracts. But their submission of two accumulator contracts and an HTA contract including the arbitration provision Defendant seeks to enforce do little to advance their position. Brickey alleges the HTA contract is "customarily" included with accumulator contracts as part of Central States standard operating procedure. But he does not assert that this HTA contract is actually connected with one of the Disputed Contracts that support the Plaintiff's Complaint. Nor can he attest that Melcher agreed to the HTA contract or the Disputed Contracts. For his part, Melcher's declaration disavows any knowledge of the accumulator contracts attached to the Defendants' motion and he states that he did not recognize or agree to the HTA contract Defendants provided.

At this point then, Defendants had not met their burden of establishing an agreement to arbitrate under Indiana law. But then came Defendants' reply and, for the first time, nine accumulator contracts with multiple HTA contracts containing arbitration clauses that Defendants assert constitute the Disputed Contracts about which Melcher complains. Plaintiff counters by attaching 37 fraudulent accumulator contracts it claims contain forged signatures to which he did not agree.

What all this means is that this Court hasn't the slightest notion of whether there is a valid agreement to arbitrate between the parties. There is evidence on both sides. Defendants have evidence of signed HTA contracts and some signed accumulator contracts they assert require arbitration. Melcher disputes his signature on some documents and claims that Shepherd procured some accumulator contracts by fraud to cover his speculative trading and it is those contracts Central States seeks to enforce by the Demand Letter. He has produced evidence of irregular signatures along with his own statements that he does not know about many of the accumulator

contracts. Thus, in his view, he could not have agreed to arbitrate disputes over fraudulently obtained accumulator contracts.

Examining the above evidence in the light most favorable to Melcher, the Court finds that a genuine dispute of material fact exists on whether a binding arbitration agreement was formed between Central States and Melcher. While Central States infers from their records that Melcher signed various HTA contracts with the arbitration clause it seeks to invoke, Melcher insists that there are at least 37 accumulator contracts that contain his forged signature and thus, to the extent those contracts can be tied to the HTA contracts Central States relies on, a question of fact looms over whether Melcher agreed to arbitrate. The Court thus concludes that the contract formation issues involving Melcher and the Defendants must be resolved by a summary trial under 9 U.S.C. § 4. The Motion to Dismiss or, in the alternative to Stay and Compel Arbitration is DENIED.

### b. Motion to Dismiss

Alternatively, Defendants move to dismiss the Complaint for failure to state a claim and for failure to allege fraud with particularity. Defendants assert that the Complaint does not properly allege that Melcher is a party to the contracts at issue; instead, Advance Grain, is the party to the sample accumulator contract Plaintiff attached. In his declaration, Melcher represents that his business is a sole proprietorship operated under the name Advance Grain and thus, it has no legal identity separate from Melcher. As a sole proprietorship, Advance Grain is not a legal entity and lacks the capacity to sue. (Dye Dep. at 23); *see Bartlett v. Heibl*, 128 F.3d 497, 500 (7th Cir. 1997) ("A sole proprietorship ... is not a suable entity separate from the sole proprietor."). Thus, there is no basis to dismiss the Complaint on that ground.

Defendants also assert that the Complaint is deficient because it does not specify which contracts were fraudulent and is thus akin to "alleging a breach of contract claim without alleging

14

which provision of the contract was breached." (ECF No. 17, at 11). But the Complaint does, in fact, specify the category of contracts that are alleged to be fraudulent, that is, accumulator contracts with forged signatures. However, to the extent Plaintiff, after conducting some minimal discovery, has identified some of the documents with specificity, the Court will permit him leave to amend the Complaint to identify the particular documents of which he is aware that are fraudulent and to perhaps (although the Federal Rules do not require it) attach them to the amended complaint.

Finally, Defendants assert that Melcher failed to plead fraud with particularity as required by Rule 9(b). A plaintiff pleading fraud must "do more pre-complaint investigation to assure that the claim is responsible and supported 'rather than defamatory and extortionate.'" *Id.*; *see also Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 738 (7th Cir. 2014). And if a plaintiff bases a fraud claim on information and belief, he must also plead the "grounds for his suspicion" to meet 9(b)'s threshold. *Pirello Armstrong Tire Corp. Retiree Medical Benefits Trust v. Walgreen Co.,* 631 F.3d 436, 443 (7th Cir. 2021) (quoting *Uni\*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 924 (7th Cir. 1992)). In sum, a complaint alleging fraud must provide all of the information in the first paragraph of any newspaper story, "the who, what, when, where, and how." *U.S. ex rel. Gross v. AIDS Research Alliance-Chicago*, 415 F.3d 601, 605 (7th Cir. 2005) (quoting *U.S. ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 376 (7th Cir. 2003)).

That said, the basic consideration underlying Rule 9(b) requires "fair notice" to a defendant of the alleged fraudulent conduct. *Vicom, Inc. v. Harbridge Merch. Servs, Inc.*, 20 F.3d 771, 777–78 (7th Cir. 1994). The Court sees no glaring Rule 9(b) problem. Fraudulent intent may be alleged generally, *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 569 (7th Cir. 2012), and the Plaintiff has gone well beyond the conclusory allegations that Rule 9(b) prohibits in describing the

15

newspaper story facts, to the extent he has knowledge of them. "To say that fraud has been *pleaded* with particularity is not to say that it has been *proved* (nor is proof part of the pleading requirement). *U.S. ex rel. Lusby,* 570 F.3d at 855. Here, Plaintiff has alleged the general scheme to defraud by Shepherd, the category of contracts that are the subject of the scheme (accumulator contracts), and the misrepresentations (fictitious promises to deliver grain).

Additionally, "[t]he particularity requirement may be relaxed for allegations of 'prolonged multi-act schemes.'" *Burgess v. Religious Tech. Ctr., Inc.*, 600 F. App'x 657, 662 (11th Cir. 2015) (citing *United States ex rel. Clausen v. Lab'y Corp. of Am., Inc.*, 290 F.3d 1301, 1314 n.25 (11th Cir. 2002)). This more "relaxed standard permits a plaintiff to plead the overall nature of the fraud and then to allege with particularity one or more illustrative instances of the fraud." *Id.* at 663. This appears to be the approach Plaintiff has taken by using the sample accumulator contract as an example of a fraudulent document. Accordingly, the Court denies the Motion to Dismiss under Fed.R.Civ.P. 9(b).[5]

## CONCLUSION

Based on the above reasoning, Central States Motion to Dismiss, or in the alternative, to Stay and Compel Arbitration. (ECF No. 16), to which Shepherd joined (ECF No. 19) are DENIED. Plaintiff's Motion to Strike (ECF No. 36) is DENIED. Plaintiff is granted leave to file an amended complaint by April 21, 2023. The Court will set this matter for a pretrial conference through separate entry.

SO ORDERED on March 30, 2023.

    s/ *Holly A. Brady*
JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT

---

[5] However, Plaintiff is free to "spruce up" the allegations of fraud in his amended complaint if he so chooses.